UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X

MARYANN ROBINSON,

        Plaintiff,

    - against -

DEUTSCHE BANK TRUST
COMPANY AMERICAS,

        Defendant.
------------------------------------X

07 CV 11189

COMPLAINT

JUDGE JONES

PLAINTIFF DEMANDS
A TRIAL BY JURY

Plaintiff Maryann Robinson ("Robinson" or "plaintiff") through her attorneys, Vladeck, Waldman, Elias & Engelhard, P.C., complains of defendant Deutsche Bank Trust Company Americas ("Deutsche Bank" or "defendant") as follows:

### NATURE OF ACTION

1. Plaintiff brings this diversity action to remedy defendant's fraudulent inducement of plaintiff to leave her prior employer and accept employment with defendant.

2. Plaintiff seeks injunctive and declaratory relief and damages and other appropriate legal and equitable relief pursuant to New York common law.

### PARTIES

3. Robinson is a citizen and resident of the State of New Jersey. Plaintiff worked for defendant from July 2007 until November 2007 as a Private Banker in defendant's Private Wealth Management Division ("PWM") with the title of Managing Director.

4. Upon information and belief, Deutsche Bank is a corporation organized and existing under the laws of New York with its principal place of business at 60 Wall Street, New

York, New York. Deutsche Bank is a wholly owned subsidiary of Deutsche Bank AG, a publicly held German banking entity.

## JURISDICTION AND VENUE

5. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1332 because of the diversity of the parties and because the amount in controversy exceeds $75,000.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the practices complained of herein occurred within the Southern District of New York and defendant resides in the Southern District of New York.

## FACTUAL ALLEGATIONS

7. In 1982, plaintiff graduated from Saint Mary's College – Notre Dame, magna cum laude, and received a B.B.A. in Finance and Accounting. In 1986, she received a Masters of Management from Northwestern University.

8. Plaintiff has worked in the banking industry since 1982. She has almost 20 years of experience as a private banker, working for various financial institutions including Citibank, N.A. and Union Bank of Switzerland.

9. Prior to joining Deutsche Bank, plaintiff worked for HSBC Bank USA ("HSBC") for nearly ten years. Her last position at HSBC was as Senior Vice President of HSBC in the Domestic Private Banking Group. In that capacity, she provided financial services to high net worth individuals with an average net worth of $50 million and their affiliates. Many of her clients at HSBC were entrepreneurs in a wide variety of industries. At HSBC, plaintiff supervised three bankers, as well as other professionals. In 2006, she earned a base salary of $300,000 and an incentive bonus of $500,000, plus a Special Stock Award. Her performance reviews at HSBC were excellent and her client base generated substantial revenue in 2006.

### Plaintiff is Recruited to Work at Deutsche Bank

10. In or around early 2006, Patrick Campion ("Campion"), then head of defendant's United State Private Bank, called plaintiff to inform her that defendant was interested in hiring her to work in its PWM as a private banker.

11. Campion stated that defendant was interested in upgrading its PWM staff by hiring senior private bankers and by expanding its products and services, particularly lending, in this area.

12. At the time, PWM provided certain services to private clients, including brokerage, investment advice and management, margin lending, trust and estate services, custody and philanthropy planning.

13. At first, plaintiff was not interested in working for defendant. Plaintiff was reluctant to leave her position at HSBC, where she had worked for ten years and built client relationships. Also she was concerned that defendant would be unable to serve her clients adequately since Campion told her that Thomas Bowers ("Bowers"), the head of the United States PWM, was planning to expand the products offered to include structured lending, customized banking, and investment services in order to attract wealthier clients and a higher caliber of private bankers. At this stage, plaintiff concluded that any discussion of joining PWM was premature.

14. In or around late 2006, a recruiter from Lockwood Gibb Associates ("LGA") called plaintiff to reiterate that Deutsche Bank was very interested in hiring her. After meeting with recruiters from LGA, plaintiff agreed to interview with Deutsche Bank.

15. In or around February 2007, plaintiff interviewed with five or six members of senior management at Deutsche Bank, including Bowers, and Kyle Delaney ("Delaney"), a Managing Director and head of the Eastern Region of the United States Private Bank.

<u>Deutsche Bank Made Material Representations to Robinson</u>

16.     Throughout the hiring process, plaintiff told each of the five or six PWM managers that she met with, including Bowers and Delaney, that she was interested in leaving HSBC only for an opportunity that would allow her to provide her clients with better service and access to credit and investment resources than they could obtain at HSBC. In each of these interviews, plaintiff extensively and explicitly described the profile of her clients: wealthy entrepreneurs with business interests and investments in a variety of industries, including commercial real estate, private equity, hedge fund management, sports franchise ownership, music publishing, and film production. Plaintiff detailed the specific lending, capital markets, and investment transactions she had executed for her clients at HSBC. In particular, she explained that her clients tended to have significant credit needs. She described the types of collateral her clients pledged to secure their loans, which included not only traditional assets such as marketable securities and residential mortgages, but also non-traditional assets such as commercial mortgages, beneficial interests in contracts, private equity in operating companies and funds, and equity interests in various investment entities. She further noted that for certain clients, HSBC had extended credit on an unsecured basis.

17.     During the hiring process in early 2007, Bowers and Delaney both told plaintiff that defendant was committed to growing the United States loan portfolio.

18.     During plaintiff's interview with Bowers, in or around February 2007, Bowers assured her that defendant could accommodate her clients' credit needs. Bowers stated that PWM had not adopted restrictive credit policies as had other lending institutions, including Citibank and JP Morgan. He said that wealthy clients could secure loans with their non-traditional assets. Bowers also said that such clients could borrow on an unsecured basis.

19. During this same interview in early 2007, plaintiff told Bowers that her clients needed access to tailored capital markets products. Bowers immediately called Ralph Tipple ("Tipple"), Managing Director and head of Private Client Investment Services ("PCIS"), a part of Deutsche Bank. Bowers asked him to speak with plaintiff. Tipple described standardized structured notes created and distributed to a wide range of clients in PWM and DB Alex Brown, a related brokerage entity. Tipple also stated that his group could provide to plaintiff's clients tailored capital markets offerings, including securities trading facilities and derivatives investments. With regard to transactions involving capital markets products, Tipple further stated that defendant had a clear process for credit approval, legal documentation, and trade execution, and that once a banker identified such a transaction, a capital markets products specialist would document and execute these transactions.

20. During the interview with Bowers, plaintiff, because of her clients' need for credit, insisted on meeting with the person or people in charge of approving loans and capital markets exposure for her clients. Bowers said that it would not be a problem and that plaintiff could meet with Elizabeth Engel ("Engel"). Bowers scheduled a meeting between plaintiff and Engel, who identified herself as acting head of PWM's Lending Group. Engel and plaintiff discussed in detail the client profiles, types of loan structures, collateral, pricing, covenants, and other terms common in plaintiff's private bank lending experience. Neither Bowers nor Engel mentioned the Credit Risk Management area ("CRM") or the fact that only CRM, and not the Lending Group, could approve loans to PWM clients or credit exposure arising from capital markets products.

21. During plaintiff's first meeting with Delaney, in or around February 2007, plaintiff asked whether defendant's PWM had a standard mortgage program that included jumbo

mortgages with the common options of 15 and 30 year fixed rates as well as 3, 5, 7, and 10 year adjustable interest rates. Delaney told plaintiff that such a program existed.

### Robinson Accepts Based on Deutsche Bank's Representations

22. Deutsche Bank sent Robinson a letter offer dated April 3, 2007, setting forth the terms of employment, including a position as Private Banker in PWM, the title of Managing Director, an annual salary of $250,000, a minimum bonus for 2007 of $650,000, a signing bonus of $50,000, and payment of $713,721 for deferred compensation that she forfeited by leaving HSBC.

23. Based on the representations described above, Robinson, on April 18, 2007, accepted the position defendant offered. After receiving notice from plaintiff, HSBC placed her on garden leave for several months. Plaintiff's employment at HSBC officially terminated on June 30, 2007. Plaintiff had told Bowers that, by leaving HSBC, she forfeited approximately $713,000 in deferred compensation and that she lost the ability to begin drawing her pension at age 55 rather than at HSBC's normal retirement age of 65.

24. Plaintiff left her job at HSBC because she reasonably relied upon the representations defendant made to her.

25. In deciding to work for defendant, plaintiff accepted $50,000 less in annual salary. The credit and other resources defendant promised during the hiring process would directly affect her ability to generate revenue and earn incentive compensation to compensate for the salary shortfall.

26. At or about the same time that plaintiff accepted defendant's offer, plaintiff was considering a position with First Republic Bank. As she advised Bowers, she declined that position based on defendant's representations described above. On June 1, 2007, Robinson emailed Bowers, stated her enthusiasm for joining Deutsche Bank, and asked him if the two could meet

before her start date to discuss some clients who were already interested in doing business with plaintiff at Deutsche Bank. Bowers did not respond to the email and, other than in group meetings, did not speak with plaintiff again until the beginning of September when plaintiff and Bowers ran into each other at the Starbucks located at 280 Park Avenue, New York, New York.

Robinson Learns that Deutsche Bank Made False Representations<br>and that Deutsche Bank Failed to Disclose Material Facts

27. Robinson began working for defendant on July 9, 2007. Shortly after plaintiff joined Deutsche Bank, it became clear to her that defendant had made serious misrepresentations and failed to disclose material information during the hiring process, and that, at the time these representations were made, defendant knew them to be untrue.

28. Contrary to Bowers' representations in early 2007 during plaintiff's interview, defendant could not accommodate her clients' credit needs. In fact, Deutsche Bank did not approve any of the loans plaintiff proposed on behalf of her clients due to the lack of unsecured lending capacity or the lack of lending guidelines for the clients' collateral.

29. Bowers did not disclose that CRM was responsible for approving loans to PWM clients during the hiring process despite plaintiff's request, in or around February 2007, to meet with the person or people responsible for approving such loans. In response to her request, Bowers said that plaintiff could meet with Engel, and he scheduled a meeting between plaintiff and Engel. As plaintiff learned after starting work at Deutsche Bank, neither Engel nor the Lending Group had the authority to approve loans to PWM clients. Instead the Lending Group underwrote loans based on guidelines CRM determined. In fact, Carl Rourke ("Rourke"), head of CRM and his staff were responsible for approving loans to PWM clients. At the time of Bowers' conversation with plaintiff in around February 2007, Bowers knew that CRM had this authority. Based on Bowers' conversation with plaintiff in February 2007, plaintiff never asked

to meet with anyone else regarding approval authority for loans to PWM clients. Because Bowers failed to disclose to plaintiff that CRM, and not Engel nor the Lending Group, was responsible for approving loans, Robinson during the hiring process was unable to ascertain that defendant had misrepresented the credit process and standards.

30. Defendant specifically misrepresented its credit standards and loan practices. Contrary to what Bowers had told plaintiff during plaintiff's interview, defendant did not recognize, for the purpose of providing loans, many types of collateral, including the non-traditional assets plaintiff's clients owned. Accordingly, the loans plaintiff's clients sought were treated as unsecured.

31. In addition, despite Bowers' assurances that plaintiff's clients could borrow on an unsecured basis, defendant capped unsecured PWM loans. After joining Deutsche Bank, plaintiff learned that a cap on unsecured loans existed and that at least half of that cap was used at the time she interviewed with Bowers, with the remainder of the capacity to be utilized by other such loans in the pipeline, i.e., that had been promised to other clients. PWM exceeded that cap by the time Robinson joined defendant in July 2007. The unsecured risk "bucket" or classification includes not only situations in which Deutsche Bank holds no security for a loan, but also credit facilities where CRM has not issued guidelines or has not previously accepted such asset types as collateral. Despite plaintiff's repeated questions about the availability of credit during the hiring process, specifically to Bowers and Delaney, she was not told that a cap existed.

32. Contrary to Tipple's representation in or around February 2007, defendant did not have a clear process for credit approval, documentation, and execution for transactions involving capital markets products. On or about July 27, 2007, plaintiff attempted, on behalf of a client, to execute a tailored capital markets transaction that involved securing a foreign exchange trading line without requiring an initial cash deposit. The client had identical foreign exchange

facility at HSBC for many years. Plaintiff explained the transaction to the PWM foreign exchange product manager, Kari Honkaniemi ("Honkaniemi"). Although Honkaniemi acknowledged that the proposed transaction "sounded good," he said he was unable to process such a transaction. Honkaniemi was unaware of whether defendant could approve a client for the line of credit so that the client did not have to post initial cash for the deal. He also did not know defendant's approval process for such a transaction, the process for a banker to request the relevant documentation, or the process for preparing the documents according to the approved terms of the transaction.

33. Plaintiff also learned, contrary to what Delaney had told her during their first meeting in or around February 2007, that defendant had no standard residential mortgage program. Rather, when she joined Deutsche Bank, Doug McDonald, the Mortgage Product Manager, informed plaintiff that there were only two possibilities for extending a residential mortgage, both introduced in 2007 and neither fixed rate loan options. Most private banks' mortgage programs, including HSBC's, offer clients several interest rate and maturity options.

34. Contrary to Bowers' and Delaney's initial representations to plaintiff in early 2007, defendant was not actually interested in expanding its lending portfolio in the United States. On or about October 5, 2007, Pierre de Weck, global head of PWM, stated to the entire PWM staff that "the lending business in the United States is now fully developed."

35. Upon information and belief, defendant knowingly misrepresented facts and failed to disclose material facts to plaintiff to induce her to leave a secure position with HSBC and to recruit her clients to move their business to Deutsche Bank.

248762 v1

9

### Plaintiff is Forced to Resign from Deutsche Bank

36. On or about July 27, 2007, and then again in September 2007, plaintiff told Delaney that the current situation was untenable because she could not properly service her clients and that her continuing inability to meet her clients' needs would ruin her reputation in the industry. She told him that the situation must be fixed or she would be forced to resign.

37. On or about September 5, 2007, plaintiff met with Bowers and Delaney. Bowers' first words were that he "didn't want to discuss the facts." He conceded that defendant's credit process was a "disaster," but assured plaintiff that he would address the issues that she raised regarding lending. Plaintiff asked for a time frame and definition of "fix"; Bowers said that he envisioned the lending process could be fixed within a month or two. At the meeting, Bowers also told plaintiff that defendant could not afford to lose her. She did not hear from Bowers subsequently.

38. On or about October 15, 2007, in a meeting between senior management from PWM Lending and CRM, Delaney expressed concern over defendant's lending practices. Specifically, he asked, "We brought all these expensive people here to do this business and how are we going to keep them if we don't want to lend?"

39. By November 2007, there was no improvement in the situation; indeed, the credit process was becoming more restrictive. Plaintiff realized that the only viable option for her to salvage her career and to try to maintain her client base was to resign, and to pursue a position at a firm that is capable and committed to all aspects of private banking.

40. In a letter dated November 5, 2007, plaintiff tendered her resignation to Deutsche Bank.

Robinson Suffered Damages as a Result of her
Reliance on Defendant's Misrepresentations and Omissions

41. As a result of defendant's misrepresentations and omissions, plaintiff gave up her job at HSBC. She lost hundreds of thousands of dollars in deferred compensation, as well as salary, bonuses, and pension benefits at age 55. She also declined a position at First Republic Bank that would have permitted her to continue her successful career in private banking. In addition, by recruiting plaintiff away from a secure, successful position at HSBC and placing her in situation where she could not accommodate her clients' needs, defendant damaged plaintiff's professional credibility and reputation within the industry.

CLAIM FOR RELIEF

42. Plaintiff repeats and realleges paragraphs 1 through 41 as if fully set forth herein.

43. Defendant fraudulently induced plaintiff to enter into employment at Deutsche Bank by making material representations of present fact that defendant knew to be untrue at the time they were made. Defendant made material misrepresentations to plaintiff with a preconceived and undisclosed intention not to fulfill them.

44. Defendant also fraudulently induced plaintiff to enter into employment at Deutsch Bank by failing to disclose that CRM was responsible for approving loans to PWM clients. At the time that Bowers responded to plaintiff's request to meet with the person or people responsible for approving loans to PWM clients, Bowers knew that CRM, and not Engel or the Lending Group, had this authority. Bowers had a duty to disclose this information to plaintiff because Bowers made an ambiguous statement that required additional information so that he would not mislead plaintiff. In addition, or in the alternative, defendant had a duty to disclose this

information because Bowers possessed superior knowledge, not readily available to plaintiff, and he knew that plaintiff was acting on the basis of this mistaken knowledge.

45. Defendant made material misrepresentations and omitted material facts to plaintiff to induce plaintiff's reliance.

46. Plaintiff reasonably relied on defendant's representations.

47. As a direct and proximate cause of the fraudulent misrepresentations and material omissions, plaintiff suffered damages, including, but not limited to, damage to her professional reputation, financial loses, and emotional distress.

48. Defendant's conduct constitutes gross, wanton, and/or willful fraud.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment:

(a) awarding damages to plaintiff for the losses plaintiff suffered as a result of defendant's misrepresentations and omissions, including, but not limited to, economic loses, injury to reputation, and emotional distress;

(b) awarding plaintiff punitive damages;

(c) awarding plaintiff the costs of this action together with reasonable attorneys' fees and interest;

(d) awarding plaintiff damages to compensate for any adverse tax consequences of the award; and

(e) granting such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated: New York, New York
       December 12, 2007

                      VLADECK, WALDMAN, ELIAS
                        &amp; ENGELHARD, P.C.

By: *[signature]*
                      Debra L. Raskin (DR 5431)
                      Attorneys for Plaintiff
                      1501 Broadway, Suite 800
                      New York, New York 10036
                      (212) 403-7300